## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

CATHERINE DUFFY, MATTHEW EDLIN,
LAWRENCE MULCAHY, PAULA HALL,
individually and on behalf of all others similarly
situated,

                Plaintiffs,

      v

MAZDA MOTOR OF AMERICA, INC.
D/B/A MAZDA NORTH AMERICAN
OPERATIONS,

               Defendant.

Case No.:    3:24-cv-388-BJB

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiffs Catherine Duffy, Matthew Edlin, Lawrence Mulcahy, Paula Hall ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" defined below), by and through their attorneys, allege as follows upon personal knowledge as to themselves, and as to all other matters upon information and belief, and based upon the investigation of their counsel.

## **INTRODUCTION**

1.     This is a class action lawsuit brought against Defendant Mazda Motor of America, Inc. d/b/a Mazda North American Operations ("Mazda" or "Defendant") by Plaintiffs on behalf of themselves and a class of current and former owners and lessees of the following vehicle models (herein referred to as the "Class Vehicles") equipped with the Mazda Connect infotainment system:

- Mazda2 model years 2016-2022
- Mazda3 model years 2014-2018
- Mazda6 model years 2016-2021
- CX-3 model years 2016-2021
- CX-5 model years 2016-2020
- CX-9 model years 2016-2020
- MX-5 model years 2016-2023

2.      Each Vehicle is equipped with an infotainment system called Mazda Connect ("Mazda Connect"). Mazda Connect is a multimedia and video interface—often referred to as an in-car entertainment or in-vehicle infotainment system—in the Vehicles' center consoles that includes, among other things: the visual for the backup camera, controls for the audio and radio system, cell phone connectivity, weather information, the navigation system, and more. An infotainment system is designed to be the gateway between the driver and the vehicle's safety, navigation, communication, and entertainment features.

3.      Below is what Mazda promises its customers with respect to the Mazda Connect infotainment system[1]:



---

[1] https://connect.mazda.com/en/ (last visited November 11, 2022).



4.      Rather than providing the advertised abilities to "stay connected without taking your hands off the wheel" or deliver "seamless connectivity between your car and your smart phone," the Class Vehicles' infotainment systems are plagued by an issue that causes many features—including the navigation, audio system, backup camera, and Bluetooth—to malfunction, operate intermittently, and even become inoperable.

5.      Specifically, the Mazda Connect system in the Class Vehicles suffers from a range of technical glitches that cause it to continuously reboot, freeze, become non-responsive, get stuck in a never-ending bootloop process, or otherwise malfunction. In other instances, Mazda Connect will drop calls, disconnect from GPS and Bluetooth, and fail to power on. The defect can also render safety-related systems to fail, such as the backup camera functions. When the system malfunctions, unexpected audio or video errors can cause the driver to become distracted. Collectively, this is referred to herein as the "Defect."

6.      Mazda has long known of the Defect from multiple sources. These include a January 15, 2020 service alert that states "some customers may complain about a MAZDA CONNECT

system reboot or blank screen."[2] Mazda was also aware of the Defect from, *inter alia,* internal warranty and repair records submitted directly to it and to its authorized dealers, pre-release testing, and complaints on consumer message boards and as collected by the National Highway Transportation Safety Administration ("NHTSA").

7.      Despite its pre-sale, superior knowledge of the Defect and the ancillary safety issues that it can cause, Mazda has failed to recall the Vehicles and has not made owners and lessees of the Vehicles whole. Instead, Mazda failed to disclose, and actively concealed, the Defect from the public, and continues to manufacture, advertise, distribute, and sell and re-sell the Vehicles without disclosing this material information.

8.      Plaintiffs bring this action individually and on behalf of the class defined below for breach of express and implied warranties, common law fraud and fraudulent omission, violations of the California Consumers Legal Remedies Act, violations of the California Unfair Competition Law, violations of the Kentucky Consumer Protection Act, and unjust enrichment.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) and (6) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Mazda regularly transacts business in this district, is subject to personal jurisdiction in this district and,

---

[2] *See* https://static.nhtsa.gov/odi/tsbs/2020/MC-10170943-0001.pdf (last June 26, 2024).

therefore, is deemed to be a citizen of this district. Additionally, Mazda advertised in this district and has received substantial revenue and profits from sales and/or leases of the Class Vehicles in this district, including to Plaintiff Duffy who is a resident of this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

## PARTIES

### Plaintiff Catherine Duffy (Kentucky)

11.     Plaintiff Catherine Duffy is a resident of Louisville, Kentucky. Plaintiff Duffy purchased a new 2018 Mazda3 Hatchback in October of 2018 from Neil Huffman Mazda, a certified Mazda dealer in Louisville. Plaintiff Duffy purchased this Vehicle for personal, family, or household use.

12.     In October of 2019, Plaintiff Duffy's Mazda Connect infotainment system began a cycle of turning off, rebooting, and freezing. This would occur as frequently as every few minutes and while Plaintiff was driving. These cycles were distracting, particularly when Duffy was relying on the navigation system. The Mazda Connect screen often would display an error message indicating that Apple CarPlay is not responding. Additionally, the rear-view camera periodically failed. Plaintiff Duffy visited Neil Huffman Mazda several times to address these issues.

13.     For approximately one year, Plaintiff Duffy continued to experience intermittent infotainment system failures. On or about September 23, 2020, the screen on her infotainment system continuously rebooted to the point that it was inoperable. When this occurred, a Mazda emblem appeared on the screen and none of the infotainment system's functions worked. Plaintiff Duffy took her Vehicle to Neil Huffman Mazda and was told that there was a service bulletin associated with the problem she was experiencing. Since her Vehicle was out of warranty, however, Mazda would have to approve the repair.

14.    On or about November 20, 2020, Plaintiff Duffy paid $50 to have the screen replaced at Neil Huffman Mazda because by this point her Vehicle was out of warranty (even though she had complained about the infotainment system to the dealer while her car was still in-warranty). The service records for this visit indicate "center stack screen not operating;" "center stack screen is bad.internal [sic];" and "CMU failure." But before she even left the parking lot following this service visit, the infotainment system rebooted again. When she advised the service technician, she was told that they had done what Mazda had told the dealer to do, and that there was nothing more they could do for her. Thereafter, the dealer would not return Plaintiff Duffy's calls. She then complained directly to corporate Mazda.

15.    At the time of purchasing her Vehicle, Plaintiff Duffy did not know that it contained the Defect, and that she would not be able to safely drive the Vehicle without risk of her infotainment system malfunctioning. Mazda omitted this information, which was material to Plaintiff Duffy's purchasing decision, given the significant safety implications of a non-functioning infotainment system. Plaintiff Duffy relied on and was deceived by this omission in deciding to purchase her Vehicle. Had Mazda disclosed the Defect on its website, through its dealership, in its warranty manual, or elsewhere prior to Plaintiff purchasing her Vehicle, Plaintiff Duffy would not have purchased the Vehicle, or would not have paid the purchase price that she paid.

16.    Plaintiff relied upon Mazda to provide the full picture of information regarding her Vehicle and relied upon the notion that Mazda would not withhold material information about safety defects in the Vehicle such as the infotainment Defect. As a result, Plaintiff received less than what she paid for her Vehicle and did not receive the benefit of her bargain. Plaintiff Duffy also has sustained out of pocket damages and has lost time associated with getting the Vehicle repaired because of the Defect.

**Plaintiff Matthew Edlin (California)**

17.     Plaintiff Matthew Edlin is a resident of Irvine, California. Plaintiff Edlin purchased a new 2016 Mazda3 on November 27, 2016 from Puente Hills Mazda, a certified Mazda dealer in City of Industry, California. Plaintiff Edlin purchased this Vehicle for personal, family, or household use.

18.     In April of 2017, Plaintiff's Mazda Connect infotainment system began a cycle of turning itself off, rebooting, and freezing. This would occur as frequently as every few minutes including during driving. These cycles were distracting, particularly when Plaintiff was relying on the navigation system for directions. It would often display an error message indicating that Pandora is not responding. Additionally, the rear-view camera also periodically failed.

19.     During the first year of having the Vehicle, Plaintiff Edlin continued to experience intermittent infotainment system failures. During this time, the screen on Plaintiff Edlin's infotainment system continuously rebooted to the point that it was inoperable. When this occurred, a Mazda emblem appeared on the screen and none of the infotainment system's functions worked. Plaintiff Edlin took his Vehicle to Puente Hills Mazda and was told that a software update would resolve the issue.

20.     However, almost immediately after receiving the initial software update, Plaintiff Edlin continued to experience the infotainment system failures. For the first two years of owning the Vehicle, Plaintiff sought repairs for the infotainment system at Puente Hills Mazda, where he purchased the Vehicle. Each time, the authorized dealership would suggest that the Vehicle had already received a software update and that there was nothing further they could do to resolve the issue. Because the numerous software updates never resolved the Defect, Plaintiff Edlin sought a second opinion at a different authorized Mazda dealership. At the second authorized Mazda

dealership, Plaintiff Edlin was told that purchasing Apple CarPlay would resolve the Defect, so he purchased Apple CarPlay for an additional out-of-pocket sum. Unfortunately, just as the prior software updates had not provided Plaintiff with a functioning infotainment system, the addition of Apple CarPlay did not resolve the Defect. In fact, the infotainment system in Plaintiff Edlin's Vehicle frequently fails to connect with Apple CarPlay, depriving Plaintiff of the additional feature for which he was convinced to pay by Mazda's dealership.

21.    Plaintiff Edlin continues to experience manifestations of the Defect on a regular basis.

22.    At the time of purchasing his Vehicle, Plaintiff Edlin did not know that it contained the Defect and that he would not be able to safely drive the Vehicle without risk of his infotainment system malfunctioning. Mazda omitted this information, which was material to Plaintiff Edlin's purchasing decision, given the significant safety implications of a non-functioning infotainment system. Plaintiff Edlin relied on and was deceived by this omission in deciding to purchase his Vehicle. Had Mazda disclosed the Defect on its website, through its dealership, in its warranty manual, or elsewhere prior to Plaintiff purchasing his Vehicle, Plaintiff Edlin would not have purchased the Vehicle, or would not have paid the purchase price that he paid.

23.    Plaintiff relied upon Mazda to provide the full picture of information regarding his Vehicle and relied upon the notion that Mazda would not withhold material information about safety defects in the Vehicle such as the Defect. As a result, Plaintiff received less than what he paid for his Vehicle and did not receive the benefit of his bargain. Plaintiff also has sustained out of pocket damages and lost time associated with getting the Vehicle repaired because of the Defect.

**Plaintiff Lawrence Mulcahy (Massachusetts)**

24.    Plaintiff Lawrence Mulcahy is a resident of Medway, Massachusetts. Plaintiff Mulcahy purchased a new 2016 Mazda6 on or about August of 2015 from the certified Mazda

dealer Ira Mazda of Westwood, Massachusetts, which was previously known as the Norwood Mazda dealership at the time of Plaintiff's purchase. Plaintiff Mulcahy purchased this Vehicle for personal, family, or household use.

25.     Within the first year of owning the Vehicle, Plaintiff's Mazda Connect infotainment system began a cycle of disconnecting from Bluetooth, Bluetooth syncing irregularity, and dysfunction with the back-up camera. This would occur as frequently as every few minutes and while Plaintiff was driving. These cycles were distracting. Most concerning to Plaintiff is when the infotainment system becomes inoperable while the car is in reverse, thus depriving him of the ability to use the backup camera. When Plaintiff's infotainment system malfunctions in this way, he must put the car in park and wait for the infotainment system to reboot and regain operability.

26.     Since purchasing the Vehicle, Plaintiff Mulcahy has experienced intermittent infotainment system failures on a regular basis. Specifically, the Bluetooth does not operate with any reliability, as it regularly disconnects, resets and lags. When this occurs, the infotainment system screen freezes and becomes completely inoperable.. The Defect also causes Plaintiff's backup camera to fail and become inoperable while the car is in reverse.

27.     Plaintiff Mulcahy continues to experience the manifestations of the Defect on a regular basis.

28.     At the time of purchasing his Vehicle, Plaintiff Mulcahy did not know that it contained the Defect and that he would not be able to safely drive the Vehicle without risk of his infotainment system malfunctioning. Mazda omitted this information, which was material to Plaintiff Mulcahy's purchasing decision, given the significant safety implications of a non-functioning infotainment system. Plaintiff Mulcahy relied on and was deceived by this omission in deciding to purchase his Vehicle. Had Mazda disclosed the Defect on its website, through its

dealership, in its warranty manual, or elsewhere prior to Plaintiff purchasing his Vehicle, Plaintiff Mulcahy would not have purchased the Vehicle, or would not have paid the price that he paid.

29.      Plaintiff relied upon Mazda to provide the full picture of information regarding his Vehicle and relied upon the notion that Mazda would not withhold material information about safety defects in the Vehicle such as the Defect. As a result, Plaintiff received less than what he paid for his Vehicle and did not receive the benefit of his bargain.

**Plaintiff Paula Hall (Florida)**

30.      Plaintiff Paula Hall is a resident of Largo, Florida. Plaintiff Hall purchased a pre-owned 2017 Mazda CX-5 in November of 2020 from Ferman Mazda, a certified Mazda dealership in Brandon, Florida. Plaintiff Hall purchased this Vehicle for personal, family, or household use.

31.      Almost immediately after purchase, in November of 2020, Plaintiff's Mazda Connect infotainment system began a cycle of turning itself off, rebooting, and freezing. This would occur as frequently as every few minutes and while Plaintiff was driving. These cycles were distracting, particularly when Plaintiff was relying on the navigation system for directions. Additionally, the rear-view camera also periodically failed.

32.      Since purchasing the Vehicle, Plaintiff Hall continues to experience intermittent infotainment system failures. As recent as December 20, 2022, the screen on Plaintiff Hall's infotainment system continuously shifted between the Bluetooth media screen to the Applications screen without manual input from Plaintiff Hall. When this occurred, Plaintiff Hall did not have control over which screen appeared on the head unit of her Vehicle's infotainment system.

33.      Plaintiff continues to experience the unsafe Defect in her Vehicle.

34.      At the time of purchasing her Vehicle, Plaintiff Hall did not know that it contained the Defect, and that she would not be able to safely drive the Vehicle without risk of her

infotainment system malfunctioning. Mazda omitted this information, which was material to Plaintiff Hall's purchasing decision, given the significant safety implications of a non-functioning infotainment system. Plaintiff Hall relied on and was deceived by this omission in deciding to purchase her Vehicle. Had Mazda disclosed the Defect on its website, through its dealership, in its warranty manual, or elsewhere prior to Plaintiff purchasing her Vehicle, Plaintiff Hall would not have purchased the Vehicle, or would not have paid the purchase price that she paid.

35.     Plaintiff relied upon Mazda to provide the full picture of information regarding her Vehicle and relied upon the notion that Mazda would not withhold material information about safety defects in the Vehicle, such as the Defect. As a result, Plaintiff received less than what she paid for her Vehicle and did not receive the benefit of her bargain.

**Defendant**

36.     Defendant Mazda Motor of America, Inc. d/b/a Mazda North American Operations is a California company located at 200 Spectrum Center Drive #100, Irvine, California 92618. Defendant Mazda North American Operations is engaged in the business of warranting, marketing, advertising, selling, and distributing vehicles under the "Mazda" brand name, including the Vehicles, through a network of hundreds of dealerships in the United States including in California. Mazda North American Operations is responsible for sales, marketing, service, distribution, import, and export of Mazda-branded products, including vehicles and parts, in California, and in the United States. Mazda North American Operations is also the warrantor and distributor of Mazda vehicles, including the Vehicles, in California and throughout the United States.

## FACTUAL ALLEGATIONS

**A.     Automobile Infotainment Systems**

37.     As connectivity, vehicle safety, and an enhanced in-vehicle user experience became a priority for consumers, automotive manufacturers began building in-vehicle infotainment systems to connect with all smart automotive technologies and integrate them with each other to provide a superior driving experience.[3]

38.     Infotainment is a catch-all term that covers the entire gamut of in-vehicle technology. The word itself is a contraction of "information" and "entertainment," which accurately conveys the purpose and function of an infotainment system.

39.     Infotainment systems are typically controlled either by a mouse-style system with a dial-controller mounted between the two front seats, or through a large central touchscreen mounted on the dashboard.

40.     In some configurations, the infotainment system can be further designed to include control functions, such as buttons, on the steering wheel for optimal safety and control for the driver.

41.     There is virtually limitless information that can be displayed to the driver. For example, vehicle infotainment systems tend to display data such as instant fuel consumption, average fuel consumption, average speed, outside temperature, miles traveled, etc. Some high-end vehicles have infotainment systems that display in-depth data about the car's behavior, including g-force generated during cornering, braking and acceleration, rate of pitch and yaw, and acceleration times.

42.     The entertainment side of infotainment systems is similarly complex and evolving, with some systems allowing the driver to receive broadcasted radio or connect a music player using either Bluetooth or a USB connection.

---

[3] *See* Anshul Saxena, *Everything You Need to Know About In-Vehicle Infotainment Systems*, EINFOCHIPS (Feb. 3, 2020), https://www.einfochips.com/blog/everything-you-need-to-know-about-in-vehicleinfotainment-system/.

43.    To provide such robust functions to a driver, an infotainment system must work in conjunction with many other in-vehicle and external systems. The main components of an infotainment system are the integrated head-unit, digital signal processors and graphic processing units, operating systems, network protocol support, and connectivity modules, and digital instrument clusters.[4]

44.    The integrated head-unit provides the interface for the infotainment system and typically models a tablet-like device including a screen, buttons and system controls for the numerous information and entertainment functions. The integrated head-unit essentially acts as the driver's control center for the infotainment system. Some modern infotainment systems also include a heads-up display in addition to the integrated head unit, which displays the vehicle's real-time information on a transparent screen integrated with the vehicle's windshield.

45.    The digital signal processors ("DSP") and graphic processing units ("GPU") are essential to the functioning of an infotainment system. A DSP is a chip that allows the infotainment system to manipulate signals from various inputs and allows the driver to manipulate and improve sound quality using the infotainment software. One of the stated benefits of a DSP is that it helps to reduce road noise and other ambient noise that can interfere with the music in a car, thus resulting in overall better sound quality.[5]

46.    The term GPU, often used interchangeably with "graphics card," refers to a chip or electronic circuit capable of rendering graphics for display on an electronic device, such as an infotainment head-unit. A GPU reads different signals from other hardware in the infotainment

---

[4] *See id*.

[5] *Car Audio DSP – Why do you need a Digital Signal Processor?*, SANTA CLARITA AUTOSOUND (Nov. 4, 2022), https://www.santaclaritaautosound.com/car-audio-dsp-why-do-you-need-a-digital-signal-processor/.

system and converts those signals to renderings that are shown on a screen.[6] It is no surprise that like any other display, such as a laptop, a GPU is needed to render an image on the screen. However, the GPUs found in most vehicles are not as powerful as those found in computers. Some vehicles employ a weaker GPU in the infotainment system, which leads to a slower (not responsive) infotainment system and limits the possibilities of additional features.[7]

47.    Infotainment systems also require operating systems that can support the display and graphic connectivity, convenience functions, and downloadable software applications to integrate new functions in the system. Common operating systems in infotainment systems are Android, Linux, QNX, and Windows. The operating system requires network protocol support, which allows the electronic hardware components of the infotainment system to communicate with each other.

48.    Infotainment systems typically encompass GPS, Wi-Fi, and Bluetooth, all of which include connectivity modules that help establish services like navigation, internet connectivity, and smartphone integration within the infotainment system.

49.    Infotainment systems contain digital instrument clusters, which include digital displays of the traditional analogue gauges in the vehicle like speedometer, RPM, odometer, etc. The digital instrument clusters fetch information from the vehicle's main electronic control unit and integrates with other digital interfaces of the vehicle to display information on the head unit of the infotainment system.

**B.    The Mazda Connect Infotainment System**

---

[6] Jake Frankenfield, *What is a Graphics Processing Unit (GPU)? Definition and Examples*, INVESTOPEDIA (Sept. 7, 2021), https://www.investopedia.com/terms/g/graphics-processing-unit-gpu.asp.

[7] Branko Gapo, *Car GPUs: Current Market Status*, GPU MAG (Oct. 4, 2022), https://www.gpumag.com/car-gpus/.

50.   The Mazda Connect system is Mazda's version of the infotainment system. It was first introduced in 2014 vehicles as a touchscreen infotainment center with a 7.0-inch display screen.

51.   The following photographs depict the display and touchpad as they appear to the driver:







52.     The infotainment system plays a critical role in modern vehicles. It is the gateway between the user and the Vehicle's safety, navigation, communications, and entertainment features. Among other operations, the Vehicle's infotainment system allows the Vehicle owner to operate the audio systems in the Vehicle, operate the backup camera, and operate a Bluetooth-enabled mobile telephone or other device.

**C.     The Mazda Connect Infotainment System Does Not Function as Represented**

53.     The Vehicles' infotainment system contains a Defect that causes many features (e.g., the navigation system, audio system, backup camera) to malfunction or become inoperable.  This includes safety features.

54.     Because the Vehicles' infotainment systems are responsible for a wide variety of Vehicle functions (including navigation, audio, video, hands-free phone, backup cameras, etc.), the Defect causes a wide range of problems for the Vehicles. For instance, the Defect can cause the entire head unit to refuse to power on or lag when the Vehicles' engine is initially started,

as well as while the Vehicle is in motion, posing a serious distraction to the driver. The Defect also has caused the infotainment system to reboot continuously, as frequently as every ten minutes.

55.     When the infotainment system reboots, freezes, glitches, or otherwise manifests the Defect, the Vehicles' GPS can disconnect or lose connection and the backup camera can shut off or flash while driving. Relatedly, the Defect causes a faulty navigation system that is unable to refresh fast enough to keep up with the navigation prompts and creates completely illogical routes because the system loses the precise GPS location of the Vehicles. Even when the infotainment system appears to be functioning properly—as in the screen is turned on—the Defect causes a digital skipping between different screen interfaces and the radio without user involvement.

56.     The Defect also interferes with the driver's ability to use the Bluetooth calling feature advertised by Defendant, exemplified by: static sounds during phone calls, the call audio switching from the Vehicles' speaker to the phone's speaker, and even phone calls completely disconnecting.

57.     Some or all the issues relating to the navigation system provided by the Mazda Connect infotainment are caused by a faulty navigation SD card, which Defendant has acknowledged in publicly available Technical Service Bulletins ("TSB") were manufactured with improper hardware. Other malfunctions of the Mazda Connect infotainment system—including, but not limited to head unit inoperability, freezing, and rebooting, the back-up camera freezing and/or glitching, skipping between radio stations and screen interfaces without driver involvement, etc.—are caused by insufficient software that cannot support the infotainment system.[8]

---

[8] Plaintiffs reserve the right to amend or add to the causes of the Mazda Connect infotainment system failures after conducting necessary fact and expert discovery.

58.    These problems pose a safety risk because when the system malfunctions, unexpected audio or video—or a blank or glitching infotainment system—can cause the driver to become distracted while the Vehicle is in motion.

59.    The Defect also causes the Vehicles' backup cameras to malfunction. Backup cameras are a critical safety feature in automobiles. Back-over crashes kill hundreds of people each year and injure thousands more.[9] Recognizing the danger posed by back-over crashes, in 2008 Congress passed the Cameron Gulbransen Kids Transportation Safety Act of 2007, requiring regulators to enact measures requiring the adoption of technology to improve rearview visibility, which was finally embodied in Federal Motor Vehicle Safety Standard number 111. The Cameron Gulbransen Kids Transportation Safety Act of 2007 states that the reason for requiring a rearview camera is "to reduce death and injury resulting from backing incidents, particularly involving small children and disabled persons." Pub. L. No. 110-189, 122 Stat. 639, 640 (2008). Accordingly, functioning backup cameras are a requirement of baseline vehicle functionality and a minimum level of quality in the Vehicles.

60.    The failure or freezing of the backup camera in the Vehicles due to the Defect can result in backover accidents and backup collisions that pose a threat to safety, especially with respect to young children.

61.    Examples of class member complaints on NHTSA forum and other websites about the backup camera in the Vehicles are set forth below (with emphasis supplied):

Complaint dated June 15, 2019:

THE INFOTAINMENT SYSTEM COMPUTER IS ON CONSTANT REBOOT LOOP. AT FIRST IT WOULD ONLY OCCUR WHEN WEATHER WAS VERY

---

[9] *See* Nathan Bomey, *Backup cameras now required in new cars in the U.S.*, USA TODAY (May 2, 2018, 8:14 AM), https://www.usatoday.com/story/money/cars/2018/05/02/backup-cameras/572079002/.

COLD OR HOT. THEN IT STARTED HAPPENING AT LEAST 75% OF THE TIME NO MATTER THE WEATHER. I HAD MAZDA DEALERSHIP LOOK AT IT PRIOR TO FULL WARRANTY RUNNING OUT, THEY COULDN'T FIND AN ORIGIN OF ISSUE AND SIMPLY CHECKED FOR SOFTWARE UPDATES. IT STARTED HAPPENING MORE FREQUENTLY AND PAST FULL WARRANTY SO CANT GET LOOKED AT OR DIAGNOSED FOR FREE. A RECALL FOR THE INFOTAINMENT SCREEN WAS NOTIFIED TO ME AND REPLACED AT DEALERSHIP BUT DID NOT RESOLVE THE ISSUE. WHEN IT REBOOTS, IT OCCURS FOR ALMOST ENTIRE DRIVE, MAKING IT ALONG WITH ALL ITS FEATURES UNUSABLE. **THIS IS DANGEROUS SINCE THE BACKUP CAMERA BLACKS OUT SPONTANEOUSLY WHEN IN REVERSE**. THE HANDS FREE DRIVING, GPS, MUSIC, AND EVERYTHING ELSE RELATING TO INFOTAINMENT SYSTEM IS UNABLE TO BE USED. MANY OTHERS HAVE HAD THIS SAME ISSUE AND MAZDA HAS NOT RECALLED THE PART. **BECAUSE IT TURNS OFF ABRUPTLY WHEN BACKUP CAM AND GPS IS IN USE, IT IS A MAJOR SAFETY ISSUE**. IT IS GENERALLY ALSO DISAPPOINTING BECAUSE A MAJOR FACTOR IN PURCHASING THAT YEAR AND MODEL OF MAZDA WAS DUE TO THE AWESOME INFOTAINMENT SYSTEM, BUT BEFORE WARRANTY EXPIRED AND AFTER I HAVE BEEN UNABLE TO USE IT 90% OF THE TIME.

Complaint dated May 12, 2021:

The Mazda Connect infotainment system will begin to press random buttons and continue to perform its own actions, at one point resulting in it dimming my screen so low I could not see my backup camera screen, which is a huge safety hazard.

## D. Defendant Knew About the Infotainment System Defect

62.    Defendant has long known or should have known of the Vehicles' infotainment system problems from multiple sources. These sources include through presentation of the Vehicles to dealerships for Defect-related Vehicle repairs; pre-release design, manufacturing, and testing data; consumer complaints made directly to Defendant, collected by NHTSA, and/or posted on public online forums; and aggregate data and complaints from authorized dealers and other sources. Yet, Defendant failed to disclose and actively concealed the Defect from the public, and continued to manufacture, distribute, and sell the Vehicles without disclosing the Defect to consumers prior to purchase or lease.

63.    Consumers presenting the Vehicles for a Defect-related repair made Mazda aware of the issue. Nevertheless, when owners and lessees of the Vehicles seek a repair for the Defect, they routinely 16  are told there is no fix and are forced to pay for this safety-related repair at their own expense.

64.    It is also standard practice for automobile manufacturers to engage in extensive pre-sale testing of their vehicles. Mazda did so for the defective Vehicles and tested the operation of the infotainment systems prior to selling the defective Vehicles. This pre-sale testing replicated actual consumer use of the Mazda Connect infotainment system and thus would have necessarily revealed the Defect to Mazda. Given the immediacy, frequency, and duration of consumer complaints about the infotainment systems in the Vehicles, Mazda learned or should have learned about the Defect before the Vehicles were taken to market.

65.    Federal regulations require automobile manufacturers to build vehicles that comply with the Federal Motor Vehicle Safety Standards (49 C.F.R. § 571). The existence of these standards necessarily requires Mazda to extensively test its vehicles prior to selling them. During this and other quality validation testing conducted by its engineers prior to their sale, Mazda became aware of the defective wiring harness.

66.    Moreover, during the decision-making process of switching from the previous generations' dual-screen infotainment system controlled by a combination of direct touch, buttons, and a rotary dial to the new single 10-inch display system controlled exclusively by a rotary dial, Mazda necessarily would have gained comprehensive and exclusive knowledge about the Defect. Such knowledge would necessarily include: the basic programming principles behind the system caused by use, age, and environmental factors; and how using different designs and technologies affect the performance of the system. This design, engineering, and testing data is unavailable to

Plaintiffs without discovery, but upon information and belief, analysis of this data would have revealed that the infotainment system was insufficient for its intended use and would inevitably malfunction.

67.    Mazda also knew or should have known of the Defect based on the raft of complaints they received directly from consumers. The large number of complaints, and the consistency of their description of the infotainment system failures, alerted Mazda of the Defect.

68.    Mazda has sole viewership of and access to the full universe of complaints they received regarding the infotainment system. However, upon information and belief, many Vehicle owners who experienced one or more of the Defect manifestations complained to Mazda. In fact, consumer complaints posted on publicly available forums reflect that Mazda received many such complaints directly from Vehicle owners.

69.    Plaintiffs' experiences are by no means isolated or outlying occurrences. Indeed, the internet is replete with examples of message boards and other websites where consumers have complained of the exact same head unit Defect in the Vehicles. The following are some of the complaints submitted on forums and social media websites by Vehicle owners[10]:

- "My daily car is a 2016 Mazda 3, Grand Touring. Yesterday, I reversed out of the garage and the back-up camera worked ok. When I then drove away, the screen just cycled the boot-up screen over and over, ie the Mazda logo, warning screen, symbols for the various functions. Neither the control knob nor the buttons worked, so for the whole of my journey I had the boot-up loop showing on the screen! The radio worked as did the volume/on-off button." (Complaint posted on Forum.miata.net dated January 27, 2022).

- "we are have the same issue with our 2016 CX-5. I have tried the reset, pulling battery cable and nothing clears it. Continuous reboot cycle. Did some research and this appears to be a widespread problem that is impacting many Mazda cars in this age range. One of my local dealers told me today that they have ordered 10 of these today alone....... another

---

[10] The following complaints are reproduced as they appear online. All typographical errors are attributable to the original author.

dealer told me that they have had a rash of these fail recently and just chucked when I told them what was going on. (Complaint posted on Forum.miata.net dated February 2, 2022).

- "The center display infotainment system, I think Mazda calls it "Mazda Connect", is not working at all. No radio, no Apple Car Play, no vehicle status, no clock, no vehicle settings...nothing. For a few seconds when I turn on the ignition and start the engine, the center display does show the 'warning' about using the system while driving, but after a second that disappears (whether I select the "OK" with the big center control knob or not). I can't get any of the various features of the system to work." (Complaint posted to cx30talk.com dated June 10, 2021).

- "Anyone else had their infotainment system screen just turn off? The radio still seems to work underneath and if I plug my iPhone in CarPlay looks to be working etc. but the screen itself is just off. I'm hoping I've somehow turned it off rather than it's failed.") (Complaint posted to cx30talk.com dated August 22, 2022).

- "I start the car, I see the Mazda logo, it goes to the home screen, then goes black. This repeats the entire time the car is on yet the rear-view camera works and it's stuck on the last radio station I played. I haven't updated the maps in months or changed anything. Anyone have any ideas how I could fix this? I've tried rebooting the system by holding back + nav + mute but nothing seems to work. 2015 3 Touring." (Complaint posted on reddit.com/r/mazda dated 2019).

- "My Mazda CX-5 has been rebooting the infotainment system for the last 6 months. I just took it to the dealer and they say it will be 700 dollars to fix it. When I bought the car I paid for the 100,000 mile warranty. I am waiting for a call back from the dealer for an explanation as to why the warranty does not cover this." (Complaint posted on reddit.com/r/mazda dated 2021).

- "I'm experiencing this issue in my 2021 Mazda 3. I drove down to my brother's house this morning and hadn't had any problems until I left his house several hours later. At that point the infotainment system rebooted every 5-7 minutes (on the entire 65 mile trip) whether or not my iPhone was plugged in. Really odd." (Complaint posted on reddit.com/r/mazda dated October 2022).

- "So recently I have been having issues with the Infotainment center in my 2015 Mazda 3. Mazda recently replaced the entire system probably in November/December 2020 because of known issues with the touch screen. They replaced this at no cost. However, the last 2 months (approximately) the entire system constantly reboots about every minute." (Complaint posted to mazdaforum.com dated February 16, 2021).

- "My Infotainment system started on a reboot loop last week. I tried all the suggested fixes by removing the nav card, hard rebooting the system etc... but no luck. I finally called the dealership to get my car in for service but they mentioned other Mazda owners were reporting the same issue. They told me they were in contact with Mazda and to call back in case there is a recall. Well I called back today and they apparently have tracked down the source of the problem or think they know what it is. It's related to listening to specific

radio stations. Mainly NPR that is causing the infotainment to crash. I guess Mazda is scrambling to figure out how to fix it. This is some super wacky stuff but I figured I would relay the message in case anyone else is experiencing the same thing. I'll post an update once I hear back more from the dealership." (Complaint posted to mazdas247.com dated February 2, 2022).

- "**Wow! I just took it** to my nearest dealer, Maxon Mazda in Union, NJ. Told them the problem and told them I thought it needed new firmware. They said this was not something I could do myself, and charged me $399.95 for the firmware and $250 for labor! I think I need to take that up with Mazda!" (Complaint posted to mazda3revolution.com dated January 1, 2021).

- "I have a 2016 CX5 Grand Touring and I live in central PA. When the temperature drops below freezing overnight (which it does most of the time in winter here), the infotainment system keeps rebooting multiple times until the cabin warms up. Once the cabin warms up, it's fine, but I can't use the nav or phone until it does. This is unacceptable. I had it in to the dealer and they updated the firmware, but it's still occurring. Anyone else have this problem?" (Complaint posted to mazdaforum.com dated March 19, 2017).

- "The Infotainment system engages in "ghost touch," where the screen scrolls through and clicks random buttons on its own. This occurs both while I am driving and while I am parked. It will change radio stations, exit out of the navigation, and click other random buttons so that I then have to turn off the display in order to get it to stop. For example, yesterday, it kept clicking the repeat button on the Bluetooth display so I was forced to listen to the same 1 second of a song until I could finally shut the Infotainment off. When this occurs while driving it is a hazardous distraction." (Complaint to NHTSA dated May 23, 2022).

- "When the vehicle is running, but not moving the touch screen display randomly jumps/changes the display. This malfunction has changed the current radio station, navigation map screen, and/or the maintenance warnings/alerts. I believe this "ghost touch" poses a safety hazard not only due to the distracting beeps and screen changes but also the random change/reset of important maintenance alerts such as oil change and tire rotations. My Mazda dealer has updated the software but did not correct the malfunction. They now say I need to pay for a replacement of the touch screen display component to correct the "ghost touch" defect." (Complaint to NHTSA dated April 4, 2022).

- "VEHICLE'S INFOTAINMENT/NAVIGATION SYSTEM FROZE UP. WHEN IN OPERATION THE SCREEN JUST BLINKS ON AND OFF. UPON BRINGING VEHICLE INTO DEALERSHIP WE WERE TOLD THAT THE ITEM IS BACKORDERED AS THERE ARE SO MANY PROBLEMS WITH THE SYSTEMS THEY HAVE NO TIME FRAME TO GET THIS PROBLEM FIXED. UPON RESEARCH ON LINE IT ALSO APPEARS MANY OTHERS ARE SHARING THEIR SAME CHALLENGES WITH SYSTEMS THAT DO NOT WORK." (Complaint to NHTSA dated July 26, 2019).

- "INFOTAINMENT SYSTEM REBOOTS NUMEROUS TIMES AFTER ENGINE IS STARTED AND CONTINUES WHILE THE VEHICLE IS IN GEAR. DURING REBOOT CYCLE, RADIO, NAVIGATION, AND OTHER FUNCTIONS OF THE INFOTAINMENT SYSTEM ARE UNAVAILABLE. SYSTEM MAY REBOOT ANYWHERE BETWEEN 1 AND 10 TIMES BEFORE THE SYSTEM STABILIZES. THIS HAS BEEN AN ON-GOING, DAILY OCCURRENCE, CAN OCCUR MULTIPLE TIMES IN A DAY, AND BEGAN 2 MONTHS AFTER VEHICLE DELIVERY." (Complaint to NHTSA dated August 10, 2017).

- "THE CAR HAS ABOUT 6300 MILES ON IT AND WE BOUGHT IT NEW. WHILE DRIVING ON THE HIGHWAY, EARLY JANUARY 2016, THE CAR "INFOTAINMENT" SYSTEM SHUT OFF AND RESTARTED ITSELF. THIS INCLUDES NAVIGATION, BLUETOOTH (MUSIC, PHONE ETC) AND THE OVERALL CAR MONITORING SYSTEM. IT HAPPENED ABOUT 4 TIMES DURING A 45 MINUTE COMMUTE. IT HAS HAPPENED A FEW TIMES PREVIOUSLY BUT ONLY ONCE PER TRIP, PERHAPS DUE TO SHORTER TRIPS. IT DOES NOT HAVE ANY DISCERNIBLE PATTERN. IT IS CONCERNING IF IT IS AN ELECTRICAL PROBLEM, AS THE WHOLE CAR IS BASICALLY ELECTRONIC, INCLUDING STEERING! (NO STEERING FLUID FOR EXAMPLE, ALL ELECTRIC) IT IS GOING TO THE DEALER TO BE CHECKED OUT THIS WEEK. I CAN SEE THE NAVIGATION SHUTTING DOWN IN THE MIDDLE OF A TRIP ALSO BEING A PROBLEM, ESPECIALLY IF IT'S THE MAIN FORM OF GUIDANCE." (Complaint to NHTSA dated January 5, 2016).

70.     As demonstrated by the above examples, Vehicle owners and lessees have complained directly to Mazda/Mazda dealers on numerous occasions regarding the failures of the infotainment system. Such persistent evidence coming directly from consumers should have alerted Mazda to the Defect.

71.     Mazda closely reviews Mazda-related message boards, consumer websites, complaints on NHTSA's website, and other websites and sources relating to its vehicles and defects, complaints, or other issues pertaining to the Mazda's vehicles, including the Vehicles. It specifically pays considerable attention to infotainment issues in its automobiles because infotainment systems play a core function in vehicle operation and are tied to vehicle safety features.

72.     Mazda specifically monitors customers' complaints made to NHTSA. Federal law requires automakers like Mazda to be in close contact with NHTSA regarding potential automobile defects, including imposing a legal requirement (backed by criminal penalties) compelling the

confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

*73.*    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of an ongoing obligation to identify potential defects in their vehicles, including safety defects. *Id.*

**E.    Defendant Failed Responses to the Defect**

74.    As noted above, Mazda issued a written manufacturer's warranty to all original purchasers and lessees, including Plaintiffs and other Class members, that states: "Mazda provides this Limited Warranty in order to remedy during the warranty period any such defects in materials and workmanship of all parts and components supplied by Mazda" and that "[t]he authorized Mazda dealer will without charge for parts or labor, either repair or replace the defective part(s)."[11]

75.    However, Mazda knew, or at the least should have known, of the Defect at the time of sale or lease of the defective Vehicles. Plaintiffs and Class members, however, had no such knowledge, as the Defect is latent in nature and not ascertainable upon reasonable examination of the Vehicle.

76.    Despite having more than an adequate opportunity to successfully remedy the Defect in the Vehicles, Defendant has failed to do so.

77.    In April 2016, Mazda issued a TSB noting that certain Vehicles experienced infotainment system malfunctions related to the navigation feature, such as the inability to set

---

[11] https://www.mazdausa.com/siteassets/pdf/owners-optimized/optimized-warranty-booklet/2021-warranty-booklet.pdf (last visited June 26, 2024).

certain cities as destinations, the failure to announce voice guidance for street names, and the navigation screen appearing black with remaining directions in the task bar. Mazda concluded that the issue could be fixed with the latest software update (Version 56.00.760 or later).[12]

78.    However, only a year later in May 2017, Mazda issued a TSB to attempt to fix the infotainment system's Bluetooth stability, connectivity, and functionality with the iPhone. Again, Mazda stated that the malfunction could be remedied with the latest software update at that time (Version 59.00.502 or later).[13]

79.    Unfortunately, a simple software update did not remedy the issue for Vehicle owners and lessees. In January 2018, Mazda issued a TSB stating that "[s]ome customers may experience the MAZDA CONNECT rebooting or the screen turning black during cold temperatures." Mazda concluded that the malfunction was caused by the Mazda Connect infotainment systems being manufactured with improper hardware, which could be corrected by the SD card being replaced.[14] A month later in February 2018, Mazda issued a similar TSB to expand the range of model Vehicles affected.[15]

80.    In August 2019, Mazda finally issued a warranty extension for certain 2014-2016 Mazda3 vehicles based on notable glitches with the Mazda Connect "Center Display," which Mazda described as "not accept[ing] touch commands properly or [] operat[ing] by itself (ghost

---

[12] *Service Bulletin*, MAZDA (Apr. 19, 2016), https://static.nhtsa.gov/odi/tsbs/2016/SB-10093145-6903.pdf.

[13] *Technical Service Bulletin*, MAZDA (June 5, 2017), https://static.nhtsa.gov/odi/tsbs/2017/MC-10120348-9999.pdf.

[14] *Technical Service Bulletin*, MAZDA (Jan. 8, 2018), https://static.nhtsa.gov/odi/tsbs/2018/MC-10129565-9999.pdf.

[15] *Technical Service Bulletin*, MAZDA (Feb. 22, 2018), https://static.nhtsa.gov/odi/tsbs/2018/MC-10136368-9999.pdf.

touch)." The warranty coverage for a repair was extended to seven years from the original warranty date and ordered Mazda dealers to "replace the center display of your vehicle with a modified one, free of charge."[16]

81.    However, the warranty extension—which merely replaced a defective component with another defective component—proved to be an unsuccessful response to the Defect. In December 2019, Mazda issued a TSB addressing all the aforementioned Defect symptoms alleged herein and stated that they can be resolved by updating the system with the newest software (Version 59.00.502 or later).[17]

82.    Since December 2019, Mazda have issued at least ten additional TSBs and Service Alerts addressing the following issues: the center display turning black right after starting, the system rebooting repeatedly after starting the vehicle, voice commands failing to be recognized, Bluetooth devices failing to connect or resume connection on a consistent basis, the parking sense screen freezing, etc. Again, Mazda recommended either replacement of the navigation SD card or software updates to resolve the manifestations of the Defect.[18]

---

[16] https://static.nhtsa.gov/odi/tsbs/2019/MC-10164268-0001.pdf (last visited June 26, 2024).

[17] *Technical Service Bulletin*, MAZDA (Dec. 19, 2019), https://static.nhtsa.gov/odi/tsbs/2019/MC-10169542-0001.pdf.

[18] *See generally Technical Service Bulletin*, MAZDA (Oct. 13, 2020), https://static.nhtsa.gov/odi/tsbs/2020/MC-10182096-0001.pdf; *Service Alert*, MAZDA (Mar. 23, 2021), https://static.nhtsa.gov/odi/tsbs/2021/MC-10189858-0001.pdf; *Technical Service Bulletin*, MAZDA (Aug. 6, 2021), https://static.nhtsa.gov/odi/tsbs/2021/MC-10200528-0001.pdf; *Technical Service Bulletin*, MAZDA (Dec. 21, 2021), https://static.nhtsa.gov/odi/tsbs/2021/MC-10206011-0001.pdf; *Service Alert*, MAZDA (Apr. 6, 2022), https://static.nhtsa.gov/odi/tsbs/2022/MC-10210879-0001.pdf; *Technical Service Bulletin*, MAZDA (May 4, 2022), https://static.nhtsa.gov/odi/tsbs/2022/MC-10213204-0001.pdf; *Service Alert*, MAZDA (May 6, 2022), https://static.nhtsa.gov/odi/tsbs/2022/MC-10213139-0001.pdf; *Technical Service Bulletin*, MAZDA (May 25, 2022), https://static.nhtsa.gov/odi/tsbs/2022/MC-10213201-0001.pdf; *Service Alert*, MAZDA (June 9, 2022), https://static.nhtsa.gov/odi/tsbs/2022/MC-10215015-0001.pdf.

83.    Despite knowing about and acknowledging the numerous problems with the Mazda Connect infotainment systems since at least late 2016, and having more than adequate opportunity to successfully remedy the Defect in the Vehicles, Mazda have failed to do so.

84.    Mazda concealed, and continue to conceal, the fact that the Vehicles contain the defective infotainment systems. Mazda also continues to conceal the fact that the replacement components and software updates it provides to purportedly repair the Defect are equally defective. Despite its knowledge of the Defect, Mazda continued to sell Vehicles without disclosing this material information, a fact which Vehicle owners and lessees cannot reasonably discover until after the purchase is made.

85.    Plaintiffs and the Class members reasonably relied on Mazda's warranties regarding the quality, durability, and other material characteristics of its Vehicles, including, but not limited to, the representation that the Vehicles contained no known defects at the time of sale or lease.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

86.    Any applicable statutes of limitations have been tolled by Mazda's knowing and active concealment of the Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the class were deceived regarding the Vehicles and could not reasonably discover the Defect or Mazda's deception with respect to the Defect.

87.    Plaintiffs and class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Mazda were concealing a defect and/or the Vehicles contained the Defect and the corresponding safety risk. As alleged herein, the existence of the Defect was material to Plaintiffs and members of the Class at all relevant times. Within the period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have

discovered—through the exercise of reasonable diligence—the existence of the Defect or that Mazda were concealing the Defect.

88.     At all times, Mazda is and was under a continuous duty to disclose to Plaintiffs and class members the true standard, quality, and grade of the Vehicles and to disclose the Defect and corresponding safety risk due to its exclusive and superior knowledge of the existence and extent of the Defect in Vehicles.

89.     Mazda knowingly, actively, and affirmatively concealed the facts alleged herein, and the Defect. Plaintiffs and class members reasonably relied on Mazda's knowing, active, and affirmative concealment.

90.     For these reasons, all applicable statutes of limitation have been tolled based on, *inter alia*, the discovery rule and Mazda's fraudulent concealment. Mazda is estopped from relying on any statutes of limitations.

## CLASS ACTION ALLEGATIONS

91.     Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seeks certification of a Nationwide Class as defined below:

> All persons residing in the United States who purchased or leased a Mazda2 2016–2022, Mazda3 2014–2018; Mazda6 2016–2021; Mazda CX-3 2016–2021; Mazda CX-5 2016–2020; Mazda CX-9 2016–2020; and Mazda MX-5 2016–2023 equipped with a Mazda Connect infotainment system (the "Nationwide Class").

92.     In addition, or in the alternative to the Nationwide Class, Plaintiffs seek to represent each of the following state-wide classes (the Nationwide Class and State-Wide Classes are collectively referred to as the "Class"):

> All persons residing in California who purchased or leased a Mazda2 2016–2022, Mazda3 2014–2018; Mazda6 2016–2021; Mazda CX-3 2016–2021; Mazda CX-5 2016–2020; Mazda CX-9 2016–2020; and Mazda MX-5 2016–2023 equipped with a Mazda Connect infotainment system (the "California Class").

All persons residing in Florida who purchased or leased a Mazda2 2016–2022, Mazda3 2014–2018; Mazda6 2016–2021; Mazda CX-3 2016–2021; Mazda CX-5 2016–2020; Mazda CX-9 2016–2020; and Mazda MX-5 2016–2023 equipped with a Mazda Connect infotainment system (the "Florida Class").

All persons residing in Massachusetts who purchased or leased a Mazda2 2016–2022, Mazda3 2014–2018; Mazda6 2016–2021; Mazda CX-3 2016–2021; Mazda CX-5 2016–2020; Mazda CX-9 2016–2020; and Mazda MX-5 2016–2023 equipped with a Mazda Connect infotainment system (the "Massachusetts Class").

All persons residing in Kentucky who purchased or leased a Mazda2 2016–2022, Mazda3 2014–2018; Mazda6 2016–2021; Mazda CX-3 2016–2021; Mazda CX-5 2016–2020; Mazda CX-9 2016–2020; and Mazda MX-5 2016–2023 equipped with a Mazda Connect infotainment system (the "Kentucky Class").

93.    The above classes are referred to collectively as the Class. Excluded from the Class are Mazda, Mazda's affiliates, officers and directors, persons or entities that purchased the Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the class definitions if discovery and/or further investigation reveal that they should be expanded or otherwise modified.

94.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Mazda and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that hundreds of thousands of impacted Vehicles have been sold and leased nationwide.

95.    **Existence/Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

    a.    whether Mazda engaged in the conduct alleged herein;

b.  whether the Mazda Connect systems equipped in the Vehicles are defective;

c.  whether Mazda sold and leased Vehicles with pre-sale knowledge of the Defect;

d.  whether Mazda knew or should have known of the Defect, and if so, how long it knew of this Defect;

e.  whether Mazda knowingly failed to disclose the existence and cause of the Defect  in the Vehicles;

f.  whether the Vehicles are unmerchantable;

g.  whether Mazda breached an express warranty made to Plaintiff and class members;

h.  whether Mazda's conduct alleged herein violates consumer protection statutes, warranty laws, and other laws as asserted herein;

i.  whether Plaintiffs and Class Members overpaid for their Vehicles in light of the Defect;

j.  whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of their Vehicles' features and functionality;

k.  whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of Mazda's conduct alleged herein, and if so, the amount or proper measure of those damages; and

l.  whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

96.  **Typicality**: Plaintiffs' claims are typical of the claims of the Class since the Plaintiffs purchased or leased a Vehicle containing the Mazda Connect system plagued with the Defect, as did each member of the Class. Plaintiffs and Class Members were injured in the same manner by Mazda's uniform course of conduct alleged herein. Plaintiffs and all Class Members have the same claims against Mazda relating to the uniform conduct and uniform latent Defect alleged herein, and the same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class Members. Plaintiffs and all Class Members sustained monetary and economic

injuries including, but not limited to, ascertainable losses arising out of Mazda's wrongful conduct in selling and failing to remedy defective Vehicles. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

97. **Adequacy**: Plaintiffs are adequate representative for the Class because their interests do not conflict with the interests of the Class that they seek to represent. Plaintiffs have retained counsel competent and highly experienced in complex class action litigation—including consumer fraud and automobile defect class action cases—and counsel intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their experienced counsel.

98. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Mazda's conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them by Mazda. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based upon, inter alia, the records (including databases, e-mails, dealership records and files, etc.) Mazda maintain regarding its sales and leases of the Vehicles.

99.    Mazda has acted, and refuse to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF EXPRESS WARRANTY
**(On behalf of All Plaintiffs and the Nationwide Class
or, alternatively, the State Classes)**

100.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

101.    Mazda is a "merchants" as defined under the Uniform Commercial Code ("UCC").

102.    The Vehicles are "goods" as defined under the UCC.

103.    Mazda expressly warranted that the Vehicles were of high quality and, at a minimum, would function properly. Mazda specifically warranted attributes and qualities of the Mazda Connect systems in the Vehicles as detailed above, including with respect to performance, quality, operability, convenience, and safety.

104.    Mazda also expressly warranted that it would repair and/or replace defects in material and/or workmanship free of charge that occurred during the applicable warranty periods.

105.    Mazda breached its warranties by selling to Plaintiffs and the Class members Vehicles with defective infotainment systems, which are not of high quality, and which are predisposed to fail prematurely and/or fail to function properly, presenting an unreasonable safety risk. Mazda also breached its warranty by failing to provide an adequate repair when Plaintiffs and the Class members presented their Vehicles to authorized Mazda dealers following manifestation of the Defect.

106. These warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Vehicles equipped with defective Mazda Connect systems.

107. Plaintiffs and Class members experienced the Defect within the warranty period. Despite the existence of express warranties (including but not limited to Mazda's New Vehicle Limited Warranty), Mazda failed to inform Plaintiffs and Class members that the Vehicles are defective and failed to fix or eliminate the Defect.

108. As a result of Mazda's actions, Plaintiffs and Class members have suffered economic damages including, but not limited to, costly repairs, loss of Vehicle use, diminished value, substantial loss in value and resale value of the Vehicles, and other related damages.

109. Mazda was provided notice of the issues complained of herein by numerous complaints filed against it, including the instant lawsuit, within a reasonable amount of time.

110. Plaintiffs and the Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Mazda's conduct described herein.

## COUNT II

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
**(On behalf of All Plaintiffs and the Nationwide Class
or, alternatively, the State Classes)**

111. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

112. Mazda is a "merchants" as defined under the UCC.

113. The Vehicles are "goods" as defined under the UCC.

114. A warranty that the Vehicles were in merchantable quality and condition is implied by law in transactions for the purchase and lease of Vehicles. Mazda impliedly warranted that the

Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

115.    The Vehicles, when sold and leased, and at all times thereafter, were not in merchantable condition, are not fit for the ordinary purpose for which vehicles are used, and fall short of a minimum expectation of quality. Specifically, the Vehicles are inherently defective in that the Mazda Connect infotainment systems—a central component to the Vehicles that go the Vehicles core functionality— are prone to a multitude of operational issues due to a common Defect. The Defect renders the Vehicles unmerchantable.

116.    Mazda was provided notice of the issues complained of herein by numerous complaints filed against them, including the instant lawsuit, within a reasonable amount of time.

117.    Plaintiffs and the other Class members have had sufficient direct dealings with either Mazda or its agents (e.g., dealerships and technical support) to establish privity of contract between Mazda on one hand, and Plaintiffs and each of the Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the Class members are intended third-party beneficiaries of contracts between Mazda and its dealers (who are Mazda's agents), and specifically, of Mazda's implied warranties. The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

118.    As a direct and proximate result of the breach of said warranties, Plaintiffs and Class members were injured, and are entitled to damages.

## COUNT III

### VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
**Cal. Civ. Code § 1750, et seq. ("CLRA")**
**(On behalf of Plaintiff Edlin and the California Class)**

119.     Plaintiff Edlin realleges and incorporate by reference the preceding paragraphs as if fully set forth herein.

120.     Mazda is a "person," under Cal. Civ. Code § 1761(c).

121.     Plaintiff Edlin is a "consumer," as defined by Cal. Civ. Code § 1761(d).

122.     Mazda's conduct, as described herein, in misrepresenting the characteristics, qualities, benefits, and capabilities of the Vehicles, or omitting material information, violates the CLRA. Specifically, Mazda violated the CLRA by omitting material facts and failing to disclose a known Defect in its Vehicles' infotainment systems, engaging in the following practices proscribed by California Civil Code section 1770(a) in transactions that were intended to result in, and did result in, the sale or lease of the Vehicles:

- representing that the Vehicles have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

- representing that the Vehicles are of a particular standard, quality, or grade if they are of another;

- advertising the Vehicles with intent not to sell them as advertised; and

- representing that the Vehicles have been supplied in accordance with previous representations when they have not.

123.     Mazda violated the CLRA by selling and leasing Vehicles with a known Defect that Mazda knew were incapable of performing as advertised, unable to deliver the benefits, qualities, and characteristics described in advertisements and promotional materials. Mazda omitted from Plaintiff Edlin and other Class members the material fact that Vehicles were sold with defective infotainment systems. Mazda omitted the fact that the defective infotainment systems posed a serious risk to the safety of drivers, passengers, and the public. These are facts that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

124.    Mazda knew, at the time it sold the Vehicles, of the material fact that the Vehicles were equipped with the Defect in the ways described above, and that the Defect substantially diminished the quality, performance, safety, and reliability of Plaintiff's and other Class members' Vehicles. Through internal pre-sale testing procedures customarily conducted by Mazda, it learned of the Defect. Further, as described above, Mazda learned about the Defect from the deluge of consumer complaints that came pouring in after the Vehicles were introduced to the market, due to complaints to NHTSA, and through warranty claims and other aggregated dealership data. Mazda's conduct in selling defective Vehicles and omitting information about the Defect was fraudulent, wanton, and malicious.

125.    Mazda's unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiff Edlin's and other Class members suffering actual damage on account of receiving a car that lacked the performance that Mazda represented the Vehicles to have and contained defective infotainment systems.

126.    Plaintiff Edlin and the other Class members paid for a car that was supposed to meet certain specifications. When they received a Vehicle that did not conform to these specifications and fell below the standards set by and described in Mazda's representations, Plaintiff Edlin and the other Class members were damaged on account of receiving a car worth less than as represented. Plaintiff Edlin and the other Class members suffered diminution in the value of Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

127.    Pursuant to section 1782 of the CLRA, Plaintiff Edlin notified Mazda in writing by certified mail of the violations of section 1770 of the CLRA and demanded that Mazda rectify the

problems associated with the actions detailed above and give notice to all affected consumers of Mazda's intent to so act.

128. Plaintiff Edlin does not currently seek damages by this claim under the CLRA. If Mazda does not respond to Plaintiff Edlin's notice and fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of Plaintiff Edlin's notice pursuant to section 1782 of the Act, Plaintiffs will seek actual, punitive, and statutory damages, costs, expenses, and attorneys' fees.

129. Pursuant to California Civil Code section 1782(d), Plaintiff Edlin seeks a Court order enjoining the above-described wrongful acts and practices of Mazda, ordering Mazda to extend repair and replacement remedies to all Class members in California.

130. Pursuant to section 1780(d) of the CLRA, attached hereto is the affidavit showing that this action has been commenced in the proper forum.

## COUNT IV

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
**(On behalf of All Plaintiffs and the Nationwide Class
or, alternatively, Plaintiff Edlin and the California Class)**

131. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

132. The Unfair Competition Law ("UCL") prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising. In the course of conducting business, Mazda committed "unlawful" business practices by, among other things, making the representations and omissions of material facts, as set forth more fully herein, and violating California Civil Code sections 1572, 1573, 1709, 1711, 1770(a)(5), (6), (7), (9), and (16), and Business & Professions Code sections 17200, et seq., 17500, et seq., and the common law.

133.    In the course of conducting business, Mazda committed "unfair" business practices by, among other things, misrepresenting and omitting material facts regarding the characteristics, capabilities, and benefits of the Vehicles. There is no societal benefit from such false and misleading representations and omissions, only harm. While Plaintiffs and other Class members were harmed by this conduct, Mazda was unjustly enriched. As a result, Mazda's conduct is "unfair" as it has offended an established public policy. Further, Mazda engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

134.    The UCL also prohibits any "fraudulent business act or practice." In the course of conducting business, Mazda committed "fraudulent business act[s] or practices" by among other things, prominently making the representations (which also constitute advertising within the meaning of section 17200) and omissions of material facts regarding the safety, characteristics, and production quality of the Vehicles.

135.    Mazda's actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading, and likely to deceive the consuming public within the meaning of the UCL.

136.    Plaintiffs were deceived as a result of their reliance on Mazda's material representations and omissions, which are described above. Plaintiffs suffered injury in fact and lost money as a result of purchasing the defective Vehicles by paying more than they should have and expending time, effort, and money to attempt to repair their Vehicles, and incurring other consequential inconvenience, aggravation, damages, and loss of money and time.

137.    Unless restrained and enjoined, Mazda will continue to engage in the above described conduct. Accordingly, injunctive relief is appropriate.

138.    Plaintiffs, on behalf of themselves and all others similarly situated, seek restitution from Mazda of all monies obtained from Plaintiffs and the other Class members collected as a result of unfair competition, an injunction prohibiting Mazda from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code section 17203.

## COUNT V

### VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT
### (Ky. Rev. Stat. § 367.110, et seq.) ("KCPA")
### (On behalf of Plaintiff Duffy and the Kentucky Class)

139.    Plaintiff Duffy incorporates by reference each preceding and succeeding paragraph as though fully set forth at length therein.

140.    Mazda is a "person" for purposes of the KCPA.

141.    Mazda conduct as alleged herein occurred in the conduct of trade.

142.    The KCPA prohibits "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade." Any person who "purchase or leases goods or services primarily for personal, financial, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by Ky. Rev. Stat. § 367.170, may bring an action under the Rule of Civil Procedure . . . ." Ky. Rev. Stat. § 267.220.

143.    Mazda violated the KCPA by concealing and failing to disclose the Defect and that the infotainment system would not function as represented at the time of purchase. Mazda had an ongoing duty to Plaintiff and the Kentucky Class to refrain from unfair and deceptive practices under the KCPA in the course of its business.

144.    The practices of Mazda, described above, violate the KCPA, for, *inter alia*, one or more of the following reasons:

a.    Mazda engaged in unconscionable commercial practices in failing to reveal material facts and information about the Vehicles, which did, or tended to, mislead Plaintiff Duffy and the Kentucky Class members about facts that could not reasonably be known by the consumer;

b.    Mazda failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

c.    Mazda caused Plaintiff Duffy and the Kentucky Class members to suffer a probability of confusion and misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

d.    Mazda failed to reveal material facts to Plaintiff Duffy and the Kentucky Class members with the intent that Plaintiff Duffy and the Kentucky Class members rely upon the omission;

e.    Mazda made material representations and statements of fact to Plaintiff Duffy and the Kentucky Class that resulted in Plaintiff Duffy and the Kentucky Class members reasonably believing the represented or suggested state of affairs to be other than what they actually were;

f.    Mazda intended that Plaintiff Duffy and other members of the Kentucky Class rely on its representations and omissions, so that Plaintiff Duffy and other Kentucky Class members would purchase the Vehicles; and

g.    Under all of the circumstances, Mazda's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

145.    Plaintiff Duffy and the Kentucky Class suffered ascertainable loss and action damages as a direct and proximate result of Mazda's concealments, misrepresentations, and/or failure to disclose material information.

146.    Mazda is liable to Plaintiff Duffy and the Kentucky Class members for damages in amounts to be proven at trial, including attorney's fees, costs, and punitive damages, as well as injunctive relief enjoining Mazda' unfair and deceptive practices, and any other relief deemed just and proper.

**COUNT VI**

**COMMON LAW FRAUD/FRAUDULENT CONCEALMENT**
**(On behalf of All Plaintiffs and the Nationwide Class**
**or, alternatively, the State Classes)**

147.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

148.    Mazda made material omissions concerning a presently existing or past fact. For example, Mazda knew about but did not fully and truthfully disclose to its customers the true nature of the inherent Defect with the Mazda Connect system. A reasonable consumer would have expected that the Mazda Connect system would not be defective and pose a serious safety risk.

149.    The facts concealed or not disclosed by Mazda to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Mazda' Vehicles or pay a lesser price.

150.    Mazda had a duty to disclose the true performance of the Vehicles and the Mazda Connect system because knowledge of the Defect and its details were known and/or accessible only to Mazda; Mazda had superior knowledge and access to the facts; and Mazda knew the facts were not known to, or reasonably discoverable by, Plaintiffs and Class members. Mazda also had a duty to disclose because they made many general affirmative representations about the qualities of their

vehicles with respect to the Mazda Connect system, including references as to convenience, safety, and general operability, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual performance of their vehicles.

151.    Had Plaintiffs and the Class known about the defective nature of the Vehicles and their Mazda Connect systems, they would not have purchased or leased the Vehicles or would have paid less for them.

152.    As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Vehicles with the Defect and all of the resulting problems.

153.    These omissions were made by Mazda with knowledge of their falsity, and with the intent that Plaintiffs and Class Members rely upon them.

154.    Plaintiffs and Class Members reasonably relied on these omissions and suffered damages as a result. To the extent that Mazda's conduct was willful, oppressive, or malicious, Plaintiffs and Class Members are entitled to an award of punitive damages.

## COUNT VII

**UNJUST ENRICHMENT**
**(On behalf of All Plaintiffs and the Nationwide Class**
**or, alternatively, the State Classes)**

155.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

156.    This claim is pleaded in the alternative to the other claims set forth herein.

157.    As the intended and expected result of its conscious wrongdoing, Mazda profited and benefited from the purchase and lease of Vehicles equipped with defective Mazda Connect systems.

158.    Mazda has voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Mazda's misconduct alleged herein, Plaintiffs and the

Class were not receiving Vehicles of the quality, nature, fitness, or value that had been represented by Mazda, and that a reasonable consumer would expect. Specifically, Plaintiffs and the Class members expected that when they purchased or leased Vehicles, they would not be equipped with a defective infotainment system.

159.    Mazda has been unjustly enriched by their fraudulent, deceptive, unlawful, and unfair conduct, and withholding of benefits and unearned monies from Plaintiffs and the Class, at the expense of these parties.

160.    Equity and good conscience militate against permitting Mazda to retain these profits and benefits.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, hereby request that this Court enter an Order against Mazda providing the following:

A.    Certification of the proposed Class(es), appointment of Plaintiffs and their counsel to represent the proposed Class, and notice to the proposed Class to be paid by Mazda;

B.    An order temporarily and permanently enjoining Mazda from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Injunctive relief in the form of a recall or free replacement program, a warranty extension, or other injunctive relief as deemed necessary;

D.    Equitable relief in the form of buyback of the Vehicles;

E.    Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.    An Order requiring Mazda to pay both pre- and post-judgment interest on any amounts awarded;

G.    An award of costs and attorneys' fees; and

H.    Such other or further relief as may be appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated: June 28, 2024

Randall S. Strause
**STRAUSE LAW GROUP, PLLC**
804 Stone Creek Parkway, Suite 1
Louisville, KY 40223
Telephone: 502-498-8268

*Local Counsel*

Benjamin F. Johns (*pro hac vice* to be filed)
*bjohns@shublawyers.com*
Samantha E. Holbrook (*pro hac vice* to be filed)
*sholbrook@shublawyers.com*
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Phone: (610) 477-8380

Andrew W. Ferich (*pro hac vice* to be filed)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

Robert Ahdoot (*pro hac vice* to be filed)
*rahdoot@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Proposed Class Counsel*

Keith T. Vernon
Andrew W. Knox
kvernon@timoneyknox.com
aknox@timoneyknox.com
**TIMONEY KNOX LLP**
400 Maryland Drive, PO Box 7544
Fort Washington, PA 19034
Telephone: (215) 646-6000

Troy M. Frederick
Beth A. Frederick
TMF@fredericklg.com
BAF@fredericklg.com
**FREDERICK LAW GROUP, PLLC**
836 Philadelphia Street
Indiana, PA 15701
Telephone: (724) 801-8555

*Additional Counsel for Plaintiffs*

## **CERTIFICATION**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Dated: June 28, 2024

_____

Randall S. Strause